***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties and their representatives. Accordingly, the Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Stephenson.
 *********** EVIDENTIARY MATTERS
Plaintiff's April 14, 2010 motion to admit additional evidence is hereby DENIED.
 *********** *Page 2 
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant on October 18, 1999.
3. Defendant is a qualified self-insured employer. At the time of the hearing before the Deputy Commissioner, the North Carolina League of Municipalities was the third party administrator. (At the present time, the third-party administrator is PMA.)
4. On October 18, 1999, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant, the City of Raleigh.
5. The City of Raleigh accepted liability for plaintiff's neck, head and shoulder injuries on a duly-approved Form 21 agreement and has paid temporary total disability benefits pursuant to Form 21 and Form 26 agreements for the following periods: October 19, 1999 to April 9, 2000, January 14, 2002 to January 22, 2002, March 13, 2002 to July 10, 2003, and from February 25, 2005 to the present and ongoing.
6. Plaintiff's medical records related to this claim are admitted into evidence as Stipulated Exhibit #2.
7. The records of the medical case manager are admitted into evidence as Stipulated Exhibit #3.
8. The records of the vocational case manager are admitted into evidence as Stipulated Exhibit #4. *Page 3 
9. A package of Industrial Commission Forms is admitted into evidence as Stipulated Exhibit #5.
10. Plaintiff's vocational case manager records, covering the periods of December 10, 2008 through the close of the record are admitted into evidence.
 ***********
Based upon all of the competent credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is forty-nine years old. He has a high school education and also completed some community college course work prior to going to work for the City of Raleigh in November 1997.
2. On October 18, 1999, plaintiff was employed by the City of Raleigh's Public Utilities Department as an Equipment Operator I earning $9.8890 per hour. On that date, plaintiff sustained injuries to his head, neck and shoulders when he was hit on the head by the tailgate of a dump truck. The City of Raleigh admitted liability for these injuries on a Form 21 agreement and commenced payment of temporary total disability at the rate of $300.36 per week.
3. Following the injury, plaintiff was transported to WakeMed, where he came under the care of Dr. Kimberly Livingston. Dr. Livingston diagnosed plaintiff with a traumatic C1 fracture and placed him in a halo for three months. Plaintiff continued to treat with Dr. Livingston until March 28, 2000, when she released him to return to work in the medium physical demand category with lifting up to 50 pounds and push/pull up to 200 pounds.
4. Plaintiff returned to work for defendant on April 9, 2000 and continued to work there almost two years. Plaintiff was taken out of work from January 14, 2002 through January 22, 2002 *Page 4 
and from March 13, 2002 until July 10, 2003. The City then reinstated payment of temporary total disability benefits, which continued until plaintiff returned to work for the City again on July 10, 2003. Thereafter, plaintiff was able to continue to work for the City until he underwent surgery on his neck with Dr. Dennis Bullard on February 25, 2005.
5. Prior to the February 25, 2005 surgery, plaintiff's primary complaints to Dr. Bullard were of neck pain, bilateral arm pain and paresthesias, and bilateral lower extremity paresthesias. By August 25, 2005, Dr. Bullard was noting in his report that "the patient has had almost total relief of his cervical pain." At that time, plaintiff's only real complaint was of upper thoracic pain. This was plaintiff's first complaint of thoracic pain in the almost 6 years since the date of injury.
6. At plaintiff's request, Dr. Bullard ordered thoracic and lumbar MRI's, which were completed on October 4, 2005 and revealed multilevel disc protrusions but no abnormality which Dr. Bullard felt warranted surgery. When Dr. Bullard testified under oath on August 28, 2008, he was unable to draw a causal connection between the thoracic complaints and the injury plaintiff sustained on October 18, 1999.
7. Following the 2005 surgery, plaintiff asked Dr. Bullard to write a letter in support of a membership at the Rex Wellness Center, "where he could do both water and land exercises on his own. . . ." Dr. Bullard then wrote a letter stating that he would support a membership for up to three months. Dr. Bullard stated in the letter that he understood this was a special request, but he thought this would help facilitate a speedy recovery, alleviate his need for narcotics, and hopefully allow him to return to the level of work to which he was accustomed. Dr. Bullard testified at his deposition that he did not envision it as a lifetime commitment. While Dr. Gwinn testified that plaintiff's exercise at the Rex Wellness Center was "very good" for him, there is no *Page 5 
evidence of record that a membership to Rex Wellness is reasonable and necessary to effect a cure, give relief, or lessen the period of plaintiff's disability.
8. Prior to undergoing the successful neck surgery, and during a time when plaintiff was experiencing headaches and ringing in the ears, plaintiff underwent a neurocognitive evaluation with Dr. Robert Condor, on March 22, 2002. During the course of the evaluation, plaintiff exhibited neurocognitive deficits in several areas, including memory and concentration. Dr. Condor diagnosed anxiety disorder which he felt was impacting plaintiff's memory abilities. Dr. Condor commented in his report that plaintiff would benefit from concrete recommendations from his doctors regarding his current status and medical prognosis, and that "it may be reasonable to reassess aspects of his memory abilities in approximately six months," after plaintiff completed a course of biofeedback training. Dr. Condor never reassessed plaintiff's neurocognitive function after the headaches and ringing in the ears resolved or after the surgery with Dr. Bullard.
9. On September 26, 2005, following an FCE that was valid in all respects, Dr. Bullard released plaintiff to return to work in the medium physical demand category, with lifting up to 50 pounds.
10. In June 2006, plaintiff came under the care of Dr. Bentley for his complaints of back pain and bilateral lower extremity tingling. Initially, Dr. Bentley recommended that plaintiff continue vocational rehabilitation within the medium work restrictions set out in the September 2005 FCE. However, after several months of continued treatment including injections in the low back, Dr. Bentley changed plaintiff's work restrictions to "no lifting over 10 pounds," in November 2006. *Page 6 
11. In January 2008, plaintiff came under the care of Dr. Gwinn at Carolina Back Institute. Dr. Gwinn recommended that plaintiff participate in the Prevail Program, which is Carolina Back Institute's four-week interdisciplinary pain management program. At his next visit with Dr. Gwinn on February 4, 2008, plaintiff requested an MRI of the thoracic and lumbar spines. The results of the thoracic MRI revealed two small disc herniations which Dr. Gwinn did not believe were significant findings and which he was unable to causally relate to the October 18, 1999 injury. With regard to the lumbar spine and bilateral lower extremity paresthesias, Dr. Gwinn prescribed Elavil for the tingling and referred plaintiff to Dr. Godbout for injections. Plaintiff testified at the hearing that as a result of this treatment, his low back complaints had resolved and his lower extremity paresthesias were much improved.
12. As part of his treatment at the Prevail Program, plaintiff was offered psychological treatment with Dr. Dan Chartier. At the outset, Dr. Chartier commented that plaintiff was "highly focused" on the fact that he believes his lumbar and thoracic spine were also injured at the time that the initial injury occurred, but had not been adequately addressed to date, and that he was virtually obsessed "on his past and imagined continued medical problems. . . ." During the course of the Prevail Program, Dr. Chartier noticed that plaintiff did not appear to be practicing the biofeedback training because he was not using the requisite number of sensors. At the conclusion of the program, Dr. Chartier stated that there were no further recommendations from a psychological standpoint, and that "it is very clear that he [Mr. Rosenberger] has his own agenda, and no doubt will carry that out to the best of his ability." When plaintiff was discharged from the four week program, Dr. Duncan's discharge recommendations were that plaintiff continue a home exercise program, continue his medications, and return to work with no lifting over 15 pounds and no frequent overhead work. *Page 7 
13. In December 2005, defendant asked Lisa Parker, a certified rehabilitation counselor with Carolina Case Management, to provide vocational rehabilitation services to plaintiff. At this point in time, plaintiff had no restrictions on sitting, standing or walking, and Dr. Bullard was of the opinion he was capable of work involving lifting up to 50 pounds. Nevertheless, from the outset Ms. Parker was met with resistance from plaintiff. Plaintiff refused to sign the Individualized Vocational Plan Ms. Parker prepared. He refused to perform volunteer work. Instead of going down to the Employment Security Commission each week and meeting with a counselor to discuss possible job openings, plaintiff conducted his job search by reviewing the ESC on-line job postings. He initially refused to participate in computer classes, and when he finally did sign up to take the classes, he only took two out of the three required courses. Even though he has no restrictions on sitting or working an eight-hour day, he continually told Ms. Parker that he did not think he was capable of working 8 hours or sitting in a classroom. He expressed an interest in taking estimating classes at Wake Tech, but after Ms. Parker obtained authorization from the City to pay for the classes, plaintiff refused to go because he did not think he was physically capable of attending class. He refused to sign up for a STARS class which is just a basic employment preparation class. When Ms. Parker suggested participating in a vocational evaluation at Community Workforce Solutions (aka Raleigh Vocational Center) and advised plaintiff that among other things, it would help him build up his stamina, plaintiff told her that he thought his self-directed swimming and hot tub activities at Rex Wellness should be considered work hardening. At various times, plaintiff has described Ms. Parker's efforts as "harassment" and "torture." When Ms. Parker met with plaintiff and his attorney in plaintiff's counsel's office to discuss non-compliance issues, plaintiff's counsel supported Ms. Parker's suggestions, prompting plaintiff to say that they had "ganged up" on him *Page 8 
during the meeting. According to Ms. Parker, no matter what direction she tried to take, she received negative feedback from plaintiff.
14. In addition, from the outset and continuing to the present time, plaintiff has failed and/or refused to complete the independent employer contacts that Ms. Parker included in his Individualized Vocational Plan and which are typically required of every employee engaged in job search, whether it be job search in the context of a workers' compensation claim or job search to collect unemployment benefits from the Employment Security Commission. Independent employer contacts involve contacting an employer directly by telephone to inquire further about an advertised or posted job, or to ask whether they have a current job opening that has not been advertised to the public. Ms. Parker explained that independent employer contacts are important because "they might lead into a job lead or an opening that we wouldn't otherwise have known about." Ms. Parker testified that oftentimes the only way to find out what the physical duties of an advertised job opening are is to actually call the employer. According to Dr. Neulicht, studies show that only 20 percent of available jobs are advertised, which is all the more reason to talk to employers. Dr. Neulicht reviewed all of Ms. Parker's reports and plaintiff's job logs and determined that plaintiff had completed only three independent employer contacts during the 2+ years Ms. Parker has been working with him. (Ms. Parker's report lists approximately 43 independent employer contacts, out of 413 assigned, but she explained that early on she gave him credit for things which were not actually independent contacts.) Rather than completing the independent employer contacts, plaintiff conducted his job search by reviewing on-line listings and newspapers. For more than two years, he has turned in weekly job logs that have been virtually identical, in that they usually list the News Observer, Southside Shopper, Craig's List, and the Employment Security Commission website as having been *Page 9 
reviewed, with the notation "nothing available within my restrictions." In fact, on at least one occasion, plaintiff turned in a job log to Ms. Parker which was just a carbon copy of one turned in previously, with the date changed. When most job ads do not go into great detail regarding the physical requirements of the job, there is no way plaintiff would know whether a job was within his restrictions if he did not contact the employer.
15. Ms. Parker explained to plaintiff many times why it was important to make independent employer contacts. When plaintiff refused to contact employers Ms. Parker found for him because she had already asked him to contact that employer previously, Ms. Parker explained to him that the employer may have an opening now that it did not have when last contacted. When plaintiff complained to Ms. Parker that he did not like to contact employers because they asked him why he was calling them if he was disabled, Ms. Parker explained to him what he should say during the call and that there was no reason he should even have to get into his work restrictions during an independent employer contact. He could simply ask the employer if they have any job openings, and if so, what the requirements of the job were, and then if the requirements exceeded his restrictions, or he was not qualified for the job, he could simply say, "thank you," and hang up.
16. On May 7, 2008, Steve Carpenter completed a vocational evaluation at plaintiff's counsel's request. Mr. Carpenter testified that he completes several vocational evaluations each year for Mr. Rosenberger's attorney, and that at least 90 percent of his vocational evaluations are performed on behalf of plaintiffs in workers' compensation cases. Mr. Carpenter administered several vocational tests, the results of which revealed that plaintiff was capable of reading, spelling and math at the high school level, that his thought content was logical and coherent, that he exhibited no significant difficulty with memory, concentration, attention, recall, registration, *Page 10 
calculation, abstraction, judgment or other mental capacity areas related to vocational function, and that he scored above-average in ability to sustain gripping or gross handling tasks in the workplace. Despite these results, and without reviewing a single report from Ms. Parker or talking to a single employer about Mr. Rosenberger specifically, Mr. Carpenter concluded after spending approximately two hours with plaintiff and based in large part upon physical restrictions which were different from those assigned by Dr. Duncan and Dr. Gwinn at the conclusion of the four-week Prevail Program, that plaintiff is not employable in any job at any functional level.
17. Dr. Ann Neulicht was retained by defense counsel to perform a vocational evaluation. Dr. Neulicht has a doctorate in rehabilitation research. She testified that of all the vocational evaluations she performs in workers' compensation cases, 55 percent are done for plaintiffs' attorneys and 45 percent are done for defense attorneys. In the course of her evaluation, and unlike Steve Carpenter, Dr. Neulicht reviewed all of Lisa Parker's reports. She conducted a labor market survey specific to Mr. Rosenberger. She followed up the labor market survey by directly consulting with the employers, and was able to identify several job opportunities that she felt were suitable for plaintiff. During the 2+ years Lisa Parker worked with plaintiff, she identified 131 job leads, none of which were proven by plaintiff to be unsuitable.
18. According to Dr. Neulicht, Steve Carpenter exceeded the proper scope and practice of a certified rehabilitation counselor by essentially making medical recommendations in terms of specific work restrictions that were more restrictive than those assigned by Dr. Gwinn and Dr. Duncan. *Page 11 
19. Having considered the testimony of Lisa Parker, Ann Neulicht, and Steve Carpenter, the undersigned place greater weight on the testimony of Ms. Parker and Dr. Neulicht.
20. Based upon the physical work restrictions assigned by plaintiff's treating physicians, and the testimony of Lisa Parker and Ann Neulicht, it is clear that it was not futile because of preexisting conditions such as age or education for plaintiff to look for other employment.
21. Plaintiff has not cooperated with vocational rehabilitation. He has not put forth reasonable effort to obtain employment and has not diligently sought other employment.
22. Based upon the competent, credible evidence of record, the undersigned find that there have been suitable jobs available for plaintiff and that he was capable of getting one, taking into account both his physical restrictions and vocational limitations.
23. Based upon the competent, credible evidence of record, the undersigned find that there existed a reasonable likelihood that plaintiff would have been hired during the course of the 2+ years that vocational rehabilitation services have been offered, if he had put forth reasonable effort to obtain employment and had diligently sought other employment. Plaintiff has therefore been capable of earning wages and is no longer totally disabled.
24. Plaintiff related in his deposition problems with his back and his legs and walking, and with hemorrhoids which are not causally related to his compensable injury. These reasons, as well as his allegations of tendonitis which are not substantiated, are among the reasons given for his failure to cooperate with vocational rehabilitation. The greater weight of the evidence is that the main reasons for plaintiff not cooperating fully with rehabilitation are unrelated to his compensable injury. *Page 12 
25. The expert medical evidence does not establish a causal connection between plaintiff's thoracic spine complaints and the injury he sustained on October 18, 1999.
26. Plaintiff retains a 40 percent permanent partial impairment to his back as a result of the October 18, 1999 injury.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. While plaintiff was entitled to a presumption of continuing disability by virtue of the approved Form 26 agreement pursuant to which defendant is currently paying total disability benefits, defendant rebutted the presumption of disability by coming forward with evidence that tended to show that suitable jobs were available to plaintiff and he was capable of obtaining suitable employment, taking into account both physical and vocational limitations. Burwell v. Winn-DixieRaleigh, 114 N.C. App. 69, 441 S.E.2d 145 (1994). Plaintiff has not cooperated with vocational rehabilitation or diligently sought other employment. Had he put forth reasonable effort to find other employment, there was a reasonable likelihood that he would have been hired. It is not necessary that defendant produce evidence that some employer has specifically offered plaintiff a job in order to rebut the presumption of disability under these circumstances.Roset-Eredia v. F.W. Dellinger, Inc. ___N.C. App. ___,660 S.E.2d 592 (2008). Plaintiff has therefore been capable of earning wages and is not entitled to further benefits pursuant to N.C. Gen. Stat. § 97-29.
2. After plaintiff reached maximum medical improvement in August 2005, he continued to collect total disability benefits under N.C. Gen. Stat. § 97-29 for a period of time *Page 13 
exceeding the number of weeks his 40 percent rating would entitle him to receive benefits under N.C. Gen. Stat. § 97-31. "Plaintiff is not entitled to recover once under N.C. Gen. Stat. § 97-29 and then again under N.C. Gen. Stat. § 97-31." Kelly v. DukeUniversity, ___ N.C. App. ___, 661 S.E.2d 745 (2008), citingCollins v. Motor Speedway Sports Corp.,165 N.C. App. 113, 598 S.E.2d 185 (2004). Finally, more than 300 weeks have elapsed since the date of injury. Therefore, plaintiff is not entitled to an award of compensation pursuant to N.C. Gen. Stat. §§ 97-29, 97-30, or 97-31.
3. Plaintiff failed to prove a causal connection between his thoracic spine complaints and the October 18, 1999 injury. Booker v. MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979); Click v. FreightCarriers, 300 N.C. 164, 265 S.E.2d 389 (1980). To the extent that plaintiff may have been entitled to a presumption that the thoracic spine complaints were related to the injury, despite the fact that the injury plaintiff sustained was to the cervical spine and not the thoracic spine, defendant rebutted that presumption with testimony from Dr. Gwinn and Dr. Bullard. Therefore, plaintiff is not entitled to medical compensation for his thoracic spine complaints.
4. Plaintiff is not entitled to an ongoing membership to Rex Wellness Center at defendant's expense, because the membership was not shown to be reasonable and necessary to effect a cure, give relief, or lessen the period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 ORDER *Page 14 
1. Plaintiff's claim for ongoing benefits pursuant to N.C. Gen. Stat. § 97-29 is hereby DENIED. Defendant may immediately terminate payment of benefits.
2. Plaintiff is not entitled to compensation pursuant to N.C. Gen. Stat. §§ 97-30 or 97-31.
3. Plaintiff is not entitled to compensation for his thoracic spine complaints.
4. Plaintiff is not entitled to an ongoing membership to Rex Wellness Center.
5. Each side shall bear its own costs.
This the 20th day of August 2010.
 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ LINDA CHEATHAM COMMISSIONER
DISSENTING WITHOUT A WRITTEN OPINION:
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1